Sebastian **MANGIAFICO**,
Plaintiff–Appellant,

v.

Richard **BLUMENTHAL**, Attorney General, John Armstrong, and Theresa Lantz, Defendants–Appellees.

**Docket No. 05–5465–cv.**

United States Court of Appeals,
Second Circuit.

Argued: Oct. 16, 2006.

Decided: Dec. 19, 2006.

Michelle Holmes, Esq., Waterbury, CT, for Plaintiff–Appellant.

Gregory D'Auria, Assistant Attorney General, for Deputy Attorney General (Jane R. Rosenberg, Assistant Attorney General, on the brief), Hartford, CT, for Defendants–Appellees.

Before KEARSE, SOTOMAYOR, and B.D. PARKER, Circuit Judges.

B.D. PARKER, JR., Circuit Judge.

## BACKGROUND

Appellant Sebastian Mangiafico, a Captain in the Connecticut Department of Corrections, appeals from a judgment of the United States District Court for the District of Connecticut (Kravitz, J.), *Mangiafico v. Blumenthal, et al.*, 358 F.Supp.2d 6 (D.Conn.2005), dismissing claims against Connecticut Attorney General Richard Blumenthal on the ground of absolute immunity. In August 1998, while assigned to Connecticut's Northern Correctional Institution, Mangiafico and other correctional officers were involved in the removal of an inmate, Duane Ziemba, from his cell. The removal occurred after Ziemba had set off the sprinkler in the cell because the correctional officers allegedly refused to feed him. Ziemba subsequently sued Mangiafico and the other officers contending that he had been injured as a consequence of excessive force used during the extraction.[1] *See* 42 U.S.C. § 1983.

Connecticut law authorizes the indemnification of state employees under certain circumstances. Section 5–141d(a) of the

---

1. A jury in the *Ziemba* action found that Mangiafico had used excessive force and awarded Ziemba $250,000 in compensatory and punitive damages. Verdict Form, *Ziemba v. Armstrong*, 433 F.Supp.2d 248 (D.Conn.2006) (No. 3:98 Cv. 2344), *appeal docketed*, No. 05–2934 (2d Cir. June 21, 2006).

General Statutes of Connecticut provides that the State "shall save harmless and indemnify" any state officer or employee from financial loss arising out of:

> any claim, demand, suit or judgment by reason of his alleged negligence or alleged deprivation of any person's civil rights or other act or omission resulting in damage or injury, if the officer, employee or member is found to have been acting in the discharge of his duties or within the scope of his employment and such act or omission is found not to have been wanton, reckless or malicious.

Conn. Gen.Stat. § 5–141d(a) (2004).[2]

Section 5–141d(b) carves out an exception to subdivision (a)'s broad indemnification provisions by affording the state Attorney General considerable discretion in whether to apply it. Subdivision (b) provides that "[t]he state, through the attorney general, shall provide for the defense" of any state officer or employee in any civil action in state or federal court arising out of an act or omission occurring (or alleged to have occurred) while the officer or employee was discharging his duties or within the scope of his employment—

> except that the state shall not be required to provide for such a defense whenever the attorney general, based on his investigation of the facts and circumstances of the case, determines that it would be inappropriate to do so and he so notifies the officer, employee or member in writing.

Conn. Gen.Stat. § 5–141d(b) (2004). Whether the Attorney General enjoys absolute immunity for his determination that the state shall not provide for a state employee's defense forms the crux of this appeal.

Finally, if the Attorney General declines to provide a defense, the employee has an additional remedy. Section 5–141d(c), authorizes the state to reimburse the employee's legal fees upon resolution of the case if:

> (1) the attorney general has stated in writing to the officer, employee or member, pursuant to subsection (b), that the state will not provide an attorney to defend the interests of the officer, employee or member, and (2) the officer, employee or member is thereafter found to have acted in the discharge of his duties or in the scope of his employment, and not to have acted wantonly, recklessly or maliciously. Such legal fees and costs incurred by a state officer or employee shall be paid to the officer or employee only after the final disposition of the suit, claim or demand and only in such amounts as shall be determined by the attorney general to be reasonable.

Conn. Gen.Stat. § 5–141d(c) (2004).

In response to Ziemba's suit, Mangiafico tendered his defense to the Attorney General, who refused him representation. Mangiafico then sued Blumenthal, former Commissioner of Corrections John Armstrong and current Commissioner Theresa Lantz pursuant to § 1983, alleging that the decision not to represent him violated rights guaranteed by the Fifth and Fourteenth Amendments. He pursued an equal protection theory contending that the decision not to represent him was "in order to use him as a scapegoat." (Am. Compl. at ¶ 28.) The defendants moved to dismiss the complaint pursuant to Rule 12(b)(6), contending, among other things,

---

**2.** Section 5–141d of the General Statutes of Connecticut was amended by 2005 Conn. Pub. Acts No. 05–114 § 3, effective October 1, 2005. Because the amendment was not retroactive, the operative statute for the purposes of the present suit is the version of the statute in effect when Mangiafico sued.

that Blumenthal was immune from suit.[3] The district court denied the motion of Lantz and Armstrong for failure to state a claim, but granted the motion as to Blumenthal on the ground that he was entitled to absolute immunity. This appeal, principally challenging the grant of absolute immunity, followed, and we affirm.

## DISCUSSION

We review the district court's dismissal of the complaint pursuant to Rule 12(b)(6) *de novo, Vital v. Interfaith Med. Ctr.,* 168 F.3d 615, 619 (2d Cir.1999), drawing all reasonable inferences in Mangiafico's favor, *Gregory v. Daly,* 243 F.3d 687, 691 (2d Cir.2001).

### I. Absolute Immunity

42 U.S.C. § 1983 purports to subject "[e]very person" acting under color of state law to liability for depriving any other person in the United States of "rights, privileges, or immunities secured by the Constitution and laws." The Supreme Court has consistently recognized, however, that " § 1983 was not meant 'to abolish wholesale all common-law immunities.' The section is to be read 'in harmony with general principles of tort immunities and defenses rather than in derogation of them.' " *Burns v. Reed,* 500 U.S. 478, 484, 111 S.Ct. 1934, 114 L.Ed.2d 547 (1991) (citations omitted).

Absolute immunity gives "public officials entrusted with sensitive tasks a protected area of discretion within which to carry out their responsibilities." *Barr v. Abrams,* 810 F.2d 358, 361 (2d Cir.1987). While absolute immunity from liability "defeats a suit at the outset," qualified immunity "depends upon the circumstances and motiva-

tions of [an official's] actions, as established by the evidence at trial." *Imbler v. Pachtman,* 424 U.S. 409, 419 n. 13, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976). Supreme Court precedent makes plain that for executive officers in general, qualified immunity represents the norm. *Harlow v. Fitzgerald,* 457 U.S. 800, 807, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982).

As an official seeking absolute immunity, Blumenthal bears the burden of showing that it is warranted for the function in question, against a presumption that qualified immunity affords sufficient protection. *Burns,* 500 U.S. at 486–87, 111 S.Ct. 1934. In determining whether state officials are entitled to absolute immunity, we employ a "functional" approach, looking at "the nature of the function performed, not the identity of the actor who performed it." *Forrester v. White,* 484 U.S. 219, 229, 108 S.Ct. 538, 98 L.Ed.2d 555 (1988); *see also Bernard v. County of Suffolk,* 356 F.3d 495, 503 (2d Cir.2004). In other words, the critical inquiry is not the official position of the person seeking absolute immunity, but the specific action for which that person seeks immunity.

The Supreme Court has accorded absolute immunity to a limited range of government officials whose duties are deemed, as a matter of public policy, to require that protection to enable them to function without fear of undue interference or harassment. For example, in *Nixon v. Fitzgerald,* 457 U.S. 731, 102 S.Ct. 2690, 73 L.Ed.2d 349 (1982), the Court extended absolute immunity to the President of the United States from damages liability predicated on his official acts. In *Stump v. Sparkman,* 435 U.S. 349, 98 S.Ct. 1099, 55 L.Ed.2d 331 (1978), a case arising from the court-ordered sterilization of a minor, the

**3.** Defendants did not seek dismissal of Mangiafico's equal protection claims under § 1983 against Lantz and Armstrong.

Court restated the principle that judges enjoy absolute immunity from damage suits arising from the performance of their official functions. *Eastland v. United States Servicemen's Fund,* 421 U.S. 491, 95 S.Ct. 1813, 44 L.Ed.2d 324 (1975), held that the activities of a Senate subcommittee, the individual senators and the committee's chief counsel were, under the speech and debate clause, entitled to absolute immunity in the face of an action to enjoin the enforcement of a subpoena issued by the subcommittee.

Of particular relevance to this appeal is the Supreme Court's extension of absolute immunity to government officials performing prosecutorial functions. In *Imbler,* a defendant whose murder conviction had been overturned in a habeas corpus proceeding sued the prosecutor pursuant to § 1983, contending that he had knowingly used false testimony and suppressed material evidence at trial. The Court held that the prosecutor was entitled to absolute immunity, even at the expense of leaving a genuinely wronged defendant without civil redress. The Court reasoned that qualified immunity would disserve the broader public interest by impairing the vigorous and fearless performance of prosecutorial responsibilities essential to the proper functioning of the criminal justice system. *Imbler,* 424 U.S. at 424, 96 S.Ct. 984. In the same vein, *Butz v. Economou,* 438 U.S. 478, 98 S.Ct. 2894, 57 L.Ed.2d 895 (1978), involved a suit by former registered futures commission merchants against the Department of Agriculture seeking damages on the ground that the Department had wrongfully initiated administrative proceedings. The Court held that persons performing adjudicatory functions within federal agencies are entitled to absolute immunity from damages liability for their judicial acts and that agency officials who perform functions analogous to those of a prosecutor are entitled to absolute immu-

nity from such liability for their participation in the decision to initiate or to continue agency proceedings. *Id.* at 512–13, 98 S.Ct. 2894; *accord Peay v. Ajello,* 470 F.3d 65 (2d Cir.2006) (absolute immunity for probation officer's preparation and submission of presentence report); *Spear v. Town of West Hartford,* 954 F.2d 63, 66 (2d Cir.1992) (absolute immunity for town's corporation counsel and its town manager authorizing a civil lawsuit); *Schloss v. Bouse,* 876 F.2d 287, 293 (2d Cir.1989) (absolute immunity for district attorney's conditional decision not to prosecute); *Barrett v. United States,* 798 F.2d 565, 572–73 (2d Cir.1986) (absolute immunity for government attorney defending state in a civil lawsuit).

We have not specifically decided whether absolute immunity protects a government official's discretionary determination regarding litigation pursuant to a statute such as Connecticut's. Three factors control this inquiry: "(1) whether a historical or common law basis exists for immunity from suit arising out of performance of the function; (2) whether performance of the function poses obvious risks of harassing or vexatious litigation against the official; and (3) whether there exist alternatives to damage suits against the official as a means of redressing wrongful conduct." *Barrett,* 798 F.2d at 571 (citing *Mitchell v. Forsyth,* 472 U.S. 511, 521–23, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985)). The absence of historical or common-law support—either direct or by analogy—for cloaking the challenged actions with absolute immunity is generally determinative. *See Malley v. Briggs,* 475 U.S. 335, 342, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986); *Tower v. Glover,* 467 U.S. 914, 922–23, 104 S.Ct. 2820, 81 L.Ed.2d 758 (1984).

Applying the first factor to this case, the district court properly observed that although "there is neither direct historical

evidence nor cases involving the immunity of a government attorney in deciding whether to represent a state employee in civil litigation," the court "may look by analogy to the historic or common law immunity granted to other figures within the judicial process." *Mangiafico,* 358 F.Supp.2d at 21; *see also Butz,* 438 U.S. at 512–17, 98 S.Ct. 2894; *Barrett,* 798 F.2d at 572–73. As a general principle, a government attorney is entitled to absolute immunity when functioning as an advocate of the state in a way that is intimately associated with the judicial process. *Imbler,* 424 U.S. at 430, 96 S.Ct. 984. By contrast, a government attorney is entitled only to qualified immunity when functioning in an administrative or investigative capacity. *See, e.g., Forsyth,* 472 U.S. at 520–21, 105 S.Ct. 2806 (no absolute immunity for the Attorney General's exercise of his national security functions); *Buckley v. Fitzsimmons,* 509 U.S. 259, 274–76, 113 S.Ct. 2606, 125 L.Ed.2d 209 (1993) (no absolute immunity when a prosecutor acts in administrative capacity); *Burns,* 500 U.S. at 492–95, 111 S.Ct. 1934 (no absolute immunity for a prosecutor offering legal advice to the police regarding interrogation practices).

We have consistently afforded absolute immunity to a government attorney's decision whether or not to initiate litigation on behalf of the state. It is well-settled law that "in initiating a prosecution and in presenting the State's case, [a] prosecutor is immune from a civil suit for damages." *Imbler,* 424 U.S. at 431, 96 S.Ct. 984. The Supreme Court has further held that government attorneys who initiate administrative proceedings are, like prosecutors, absolutely immune from liability since "[t]he decision to initiate administrative proceedings against an individual or corporation is very much like the prosecutor's decision to initiate or move forward with a criminal prosecution." *Butz,* 438 U.S. at 515, 98 S.Ct. 2894. Applying the reasoning of these holdings, we have held that absolute immunity also applies to a government attorney's decision not to initiate a criminal prosecution. *Schloss,* 876 F.2d at 293. We have expanded this principle to apply to the functions of a government attorney "that can fairly be characterized as closely associated with the conduct of litigation or potential litigation" in civil suits—including the defense of such actions. *Barrett,* 798 F.2d at 572; *see also Spear,* 954 F.2d at 66; *Dacey v. Dorsey,* 568 F.2d 275, 278 (2d Cir.1978).

In light of this precedent, we can divine no meaningful difference between the Attorney General's decision in this case not to defend a state employee and the decisions of prosecutors and government attorneys to initiate (or not to initiate) civil or administrative proceedings. In both instances, the government attorney is serving as an advocate of the state, determining whether to commit the state's resources, reputation, and prestige to litigation. The structure of the statute confirms this conclusion since under its terms the state funds the defense or indemnifies the official. The state withholds the provision of a defense when the Attorney General, acting on its behalf, determines that a state-supported defense of the employee would be inappropriate. Conn. Gen.Stat. § 5–141d(b). This legislative scheme stands in contrast to *Blouin ex rel. Estate of Pouliot v. Spitzer,* 356 F.3d 348 (2d Cir.2004), on which Mangiafico relies, where we held that absolute immunity is not available when a government attorney intervenes in an action to serve as an advocate for a terminally ill individual since the state's interests are "derivative of" the individual's interests. *Id.* at 358. Here, in contrast to *Blouin,* the Attorney General's decision directly—not derivatively—affects "the application of state legal resources,

state policy, and state prestige." *Mangiafico*, 358 F.Supp.2d at 24. It is apparent to us that in deciding not to commit the state's financial and legal resources to Mangiafico's defense, Blumenthal served as an advocate for the state and performed functions analogous to those of agency officials or prosecutors and other government attorneys whose decisions to commit or not commit the state are protected by absolute immunity.

Turning to the second, "public policy" prong of the three-factor test—notably, the risks to important governmental functions posed by vexatious litigation—we believe that well-grounded public policy supports absolute immunity from suits by state employees who are denied representation. To hold otherwise would permit outsiders to second-guess delicate decisions deliberately lodged by the legislature with the state's primary legal representative. The threat of a protracted lawsuit with extensive discovery, not to mention the prospect of money damages, would inevitably involve the diversion of the government's attention and resources and cause an Attorney General to "shade his decisions instead of exercising the independence of judgment required by his public trust." *Imbler*, 424 U.S. at 423, 96 S.Ct. 984. It is not in the public interest that the Attorney General be constrained in making decisions under the Connecticut statute by potential consequences such as his own liability in a suit for damages. The defense of such suits would necessarily complicate, if not intimidate, the making of what may be routine, discretionary decisions, even where the Attorney General's decision was supported by the outcome of

the underlying case. For these reasons we believe that qualified immunity is inadequate to ensure that the Attorney General can properly decide whether to defend a state employee in litigation pursuant to his statutory responsibilities without the specter of harassment or intimidation.

Regarding the third factor, alternative means for redressing wrongful conduct have already been provided by the legislature. If Mangiafico were found to have acted within the scope of his employment in the discharge of his duties and not to have acted wantonly, maliciously, or recklessly, Connecticut law would mandate post-litigation reimbursement from the state for legal costs and fees. *See* Conn. Gen.Stat. § 5–141d(c). Thus, if Mangifico acted reasonably—but in some respect improperly—the state would be obligated to make him whole. Only if he acted wantonly or maliciously, *see supra* note 1, are such payments barred. We have little difficulty in concluding that this alternative means of redress is adequate and that its existence further supports granting absolute immunity.[4]

Accordingly, we affirm the district court's dismissal of the claims against Blumenthal on the ground that he is absolutely immune from liability for his decision not to represent Mangiafico.

## II. Consideration of Evidence Outside of the Complaint

█ Mangiafico also claims that the dismissal of the complaint as to Blumenthal should be reversed because the district court improperly considered evidence outside of the complaint,[5] including: (1) the

---

**4.** Other remedies available here, including professional disciplinary action and impeachment, have been considered sufficient in previous cases affording absolute immunity. *See, e.g., Imbler*, 424 U.S. at 429, 96 S.Ct. 984 (professional discipline of prosecutor by peers

(bar association)); *Nixon*, 457 U.S. at 757–58, 102 S.Ct. 2690 (impeachment and voters' refusal to re-elect).

**5.** Mangiafico argues that the district court should have converted the motion to dismiss

docket sheet in the *Ziemba* action; (2) counsel's response to questions at oral argument regarding matters outside the complaint (which were confirmed by the *Ziemba* docket); and (3) a letter to Mangiafico from the Attorney General's office, dated January 12, 2001, that was attached to Blumenthal's motion to dismiss. We are unpersuaded.

We have held that for the purposes of deciding a motion to dismiss pursuant to Rule 12(b)(6):

> [T]he complaint is deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference. Even where a document is not incorporated by reference, the court may nevertheless consider it where the complaint relies heavily upon its terms and effect, which renders the document integral to the complaint.

*Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152–53 (2d Cir.2002) (internal citations and quotations omitted). Furthermore,

> the harm to the plaintiff when a court considers material extraneous to a complaint is the lack of notice that the material may be considered. Accordingly, where plaintiff has actual notice of all the information in the movant's papers and has relied upon these documents in framing the complaint the necessity of translating a Rule 12(b)(6) motion into one under Rule 56 is largely dissipated.

*Id.* at 153 (internal citations and quotations omitted).

Here, while we believe that the references made by the district court to documents outside of the record were unnecessary to reach its holding, we nevertheless find no error in the district court's reliance

on the *Ziemba* docket sheet because (1) docket sheets are public records of which the court could take judicial notice, *see Pani v. Empire Blue Cross Blue Shield*, 152 F.3d 67, 75 (2d Cir.1998), and (2) Mangiafico's complaint incorporated pleadings from the *Ziemba* action referred to in the docket sheet, *Chambers*, 282 F.3d at 153. The district court also properly relied on counsel's representation (confirmed by the docket sheet) that the Attorney General's Office initially filed an appearance on behalf of Mangiafico in *Ziemba*. Indeed, since Mangiafico does not dispute that the Attorney General initially filed an appearance on his behalf, the argument is an odd one. Finally, reference to a letter attached to the state's motion to dismiss was not erroneous because the court did not rely on the letter as a basis for its decision but simply referred to it for background. *See Hayden v. County of Nassau*, 180 F.3d 42, 54 (2d Cir.1999) (When "the court simply refers to supplementary materials, but does not rely on them or use them as a basis for its decision, the 12(b)(6) motion is not converted into a motion for summary judgment.").

## CONCLUSION

For the foregoing reasons, we AFFIRM the decision of the district court.

---

into a motion for summary judgment before considering evidence outside of the complaint.